*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
July 30, 2019

Plaintiff-Appellee,

v

No. 337865
Kent Circuit Court
LC No. 05-012604-FC

MATTHEW LEE ROBINSON,

Defendant-Appellant.

Before: SAWYER, P.J., and BORRELLO and SHAPIRO, JJ.

PER CURIAM.

Defendant appeals by leave granted the trial court's order denying his motion for relief from his judgment of sentence on the basis of newly discovered evidence and seeking a new trial under MCL 6.500 *et seq*. Although it did not hold an evidentiary hearing, the trial court determined that certain newly discovered evidence would not have altered the outcome of defendant's 2007 jury trial. We denied defendant's application for leave to appeal on technical grounds after concluding that defendant could not appeal the denial of a successive motion for relief from judgment. The Supreme Court remanded the matter to this Court for consideration as on leave granted. See *People v Robinson*, 503 Mich 883; 919 NW2d 59 (2018). In its remand order, the Supreme Court instructed:

> The defendant alleges new evidence in the form of (1) the full and unredacted incident report, which the defendant claims was suppressed in violation of *Brady v Maryland*, 373 US 83 (1963); and (2) statements from two suspects identified in that report, including a confession from one of the suspects. Under MCR 6.502(G)(2), a defendant may file a second or subsequent motion for relief from judgment based on "a claim of new evidence that was not discovered before the first such motion." See also *People v Swain*, 499 Mich 920 (2016). [*Robinson*, 503 Mich at 883.]

With this instruction in mind, we now conclude that the trial court erred by prematurely and summarily denying defendant's motion for relief from judgment. We reverse and remand to the trial court for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. DEFENDANT'S 2007 JURY TRIAL

In 2007, a jury convicted defendant of two counts of armed robbery in violation of MCL 750.529 and the trial court sentenced him as a fourth-offense habitual offender to concurrent terms of 33 to 50 years' imprisonment. We glean the following facts from the original trial court record.

On August 23, 2005, an armed robbery occurred at a convenience store in Tyrone Township, Kent County, Michigan. At around 10:05 p.m., just after the store closed for the night, a man came through the door "covered in black" and with his face only partially visible. Wielding a silver and black handgun, the man insisted that the two store attendants, who happened to be husband and wife, "[p]ut all the money in this bag," pointing to his dark-colored duffle bag. He also demanded cigarettes. Having obtained about $650 in cash and two cigarette cartons, the man fled from the store. After he left, one of the victims went to the door to see what type of car the robber was fleeing in. The victim then got into his pickup truck and attempted to follow the car, which "took off at a high rate of speed." The victim could not get close enough to see the license plate number and, ultimately, lost control of the truck while making a sharp turn and the truck went off the road and into a ditch.

Shortly after the robbery took place, law enforcement arrived on the scene and took the statements of both victims. Sometime thereafter, police dispatch advised that a road-rage incident had occurred nearby that might have related to the armed robbery. The instigating vehicle in this separate incident was a white Lincoln Town Car. One of the law enforcement officers responded to that vehicle's registered address. The house was dark. No one answered at the door. The law enforcement officer also acknowledged that several bystanders told him that they had seen a suspicious white car around the convenience store prior to the robbery. Nevertheless, the officer made no further investigation.

The responding officers turned over their reports to the detective assigned to the case. The detective testified that he identified defendant as a possible suspect. At a physical lineup, both victims were "positive" that defendant was the man who robbed them, identifying him both by sight and by voice, emphasizing his light complexion and distinctive voice. While adamant that defendant was the perpetrator, both victims separately testified that the perpetrator had pulled up his black hooded sweatshirt over his face so that they could only see "a few strands of hair," eyebrows, and cheeks. When presented with his original statement to the police in which he stated that the robber had worn a black ski mask, one of the victims, who also happened to be an NRA licensed instructor for personal protection, insisted that the police officer who took the statement had made a mistake and that the robber did not, in fact, wear a black ski mask as originally reported. The detective also testified that defendant had made some statements that he believed incriminating, including saying, "Yeah, I know," after the detective told him that no one was shot during the armed robbery, and asking after the physical lineup whether "she" picked him out. The detective took this latter statement as evidence that defendant had knowledge of the gender of one of the two victims. At this point, the detective closed the case and obtained a warrant for defendant's arrest.

Subsequently, the detective learned that a man named Thomas Grantham had information about an armed robbery and "was looking for some exchange on some charges that he was going through, consideration." The detective described how this scenario was not unusual at all, and "a lot of times it is very helpful in getting through some particularly hard cases." Grantham believed that another man named James Eller had committed the armed robbery. The detective interviewed Eller, who was incarcerated at the prison in Muskegon. At a second interview, Eller admitted that what he had told the detective in Muskegon was not entirely truthful. Eller asserted that Grantham committed the robbery and indicated that he might be able to identify Grantham's accomplice. Overall, the detective considered Eller uncooperative. During cross-examination, defense counsel focused her questioning on the detective's interaction with Grantham and Eller, and each individual's respective accusations. The detective described how Eller claimed that Grantham "wanted him to go and get the black bag that the money was put in" and gave Eller directions north from the store. Eller stated that he found the black bag, which contained money, shoes, and a mask. Although Eller referred to a red-haired man as Grantham's accomplice, Eller did not accuse defendant of any involvement and could not pick defendant out of a photographic line-up.

The detective also testified that the defendant's vehicle, a Chevy Beretta, was not white. However, after that vehicle had been impounded for a reason unrelated to this case, investigators identified a smashed carton of Basic Lights cigarettes in the vehicle's inventory, which, although a common brand, was notably the same brand stolen from the store. The detective acknowledged that "there was talk of a white vehicle from different people" and that he attempted "to track that white vehicle down" but never actually saw the white '92 Lincoln that the responding officer had located the night of the incident. The detective did not refer to the investigation of any other white vehicles.

On this evidence, the prosecution rested. Defendant did not present any witnesses. At the close of evidence, defense counsel moved for a mistrial based on an allegation of a discovery violation by the prosecution, asserting that she had received only one police report at the start of trial and that she had never seen the report referring to the smashed cigarette carton inventoried in defendant's impounded vehicle. She argued that had she obtained the information concerning Eller and Grantham earlier, she "would have been able to investigate those to determine exactly what was going on."

In response, the prosecutor maintained that he had given defense counsel "an opportunity for the past ten or fifteen minutes" to go through the detective's file and did not "believe there is any exculpatory evidence that was kept from the defense." He admitted that he was not previously aware of the cigarette package and that the reports concerning Eller and Grantham "didn't come over in the initial package of materials." He maintained that "[w]hat those reports mainly consist of are those two individuals pointing the finger at one another" and "[t]here is a lot of material in there, none of it which really pertains to this particular incident." He acknowledged that there were additional reports but believed them unrelated to the armed robbery at issue in this case.

After hearing this argument, the trial court denied defendant's motion for a mistrial. Notably, the trial court acknowledged that exchange of discovery was a "chronic problem" and that "[i]t doesn't always surface as an issue but when it does, it has the same explanation, that

material has been gathered by the detective which was not communicated to either party." The jury convicted defendant of two counts of armed robbery in violation of MCL 750.529. The trial court sentenced defendant as a fourth-offense habitual offender to concurrent terms of 33 to 50 years' imprisonment.

In an unpublished per curiam opinion, this Court affirmed defendant's convictions. See *People v Robinson*, unpublished per curiam opinion of the Court of Appeals, issued July 1, 2008 (Docket No. 277796).

## B. UNREDACTED POLICE REPORTS

For several years, defendant unsuccessfully sought all of the police reports related to the investigation under the Freedom of Information Act (FOIA), MCL 15.231 *et seq*. The Sheriff's Department eventually produced a heavily redacted copy of the police reports. Unsatisfied with the redactions, defendant and his mother made additional FOIA requests. In 2014, defense counsel made a FOIA request for the same reports. Finally, in 2015, after an appeal to the Kent County Board of Commissioners, defense counsel obtained a copy of the entire, unredacted police reports. These reports formed the basis of defendant's motion for post-judgment relief.

Without the benefit of an evidentiary hearing, we cannot discern with certainty which documents were available to the defense at the time of trial. The prosecution maintains that none of these documents are new because defense counsel had the opportunity to review the detective's file during the course of trial. Notably, however, when considering defendant's application for leave to appeal, our Supreme Court issued an interim order directing the prosecution to respond and specifically ordered that "the prosecutor shall address what reports were referenced at trial during the parties' arguments on the defendant's motion for a mistrial and who reviewed those reports." See *People v Robinson*, 915 NW2d 373 (2018). The prosecution was evidently unable to comply with this mandate as its response did not provide any specific information resolving this question. Our review of the complete and unredacted reports leads us to the conclusion that there were several, possibly significant reports containing information only provided to defendant for the first time in 2015. While we cannot catalog each report definitively on this record, the trial court appeared to accept that the reports constituted newly discovered evidence.

Several reports detailing the competing accusations of Eller and Grantham were potentially significant to the defense. Multiple bystanders canvassed by police described a suspicious white vehicle; at least one witness identified the white car as possibly a Grand Am. Notably, another report detailed Grantham's claims to the investigating detective that Eller, his former roommate, had confessed to using Grantham's white Grand Am to commit the robbery and had ruined the vehicle's tires in the ensuing getaway. According to the detective's report:

Grantham said that Eller asked to use his car. He returned later and said I just ruined your car. They checked on it and it appeared that Eller had slammed on his brakes and flat-sided the front tires.

Eller told him what happened. Eller told him that he robbed the store at 17 and Sparta. Eller parked the car by the trailer park. He said that there was an old man

and woman in the store. He went in and demanded money. Eller told him that it was funny how scared the older woman was. Eller told him that he took a black duffel bag in with him with the words bum on the side.

Eller told him that he got money. Grantham said that Eller would usually tell him if he got cigarettes from doing a job and this time he did not say anything other than he got money and that he would pay for the new tires.

Eller left the store and said that someone in a truck was chasing him north on Sparta from 17 Mile Rd. Eller told him that he had to slam on his brakes to make the turn eastbound on 18 Mile from Sparta and barely made the turn. The truck did not make it and went into the ditch.

Eller told him that he threw the gun out near 18 and Sparta into the ditch. Eller told Grantham that he wiped the gun off before throwing it out the window. He also told Grantham that he went back up to the area in an attempt to find the gun but was not able to locate it.

Grantham said that Eller got the gun for the robbery from his son. He said that the gun was a metal dart type gun. He said that it was chrome and black and had a black extension on the barrel.

Importantly, in addition to knowing these remarkably unique facts concerning the circumstances of the crime, Grantham also evidently told the detective that he went to an auto repair shop and had both front tires replaced the next day. The detective was able to confirm that Grantham had his white Grand Am serviced at a Firestone Complete Auto Care on August 24, 2005, the day after the robbery, for two new tires. In fact, the detective was able to obtain the work order and noted "that should be included with this report," although it apparently never was.

For his own part, in a separate police report, Eller initially denied having any knowledge of the robbery and denied that he ever had to replace tires on Grantham's car. Eller accused Grantham of having committed the robbery. Eller claimed that he overheard Grantham and "some red-haired guy" who "were talking about getting chased and having some fun." Eller thought the red-haired individual's name was Kevin or Keith. Eller claimed that he could take a polygraph and pass it. At a subsequent interview, Eller once again said that he still wanted to take the polygraph exam but admitted that he had not been truthful before because "he was not sure how the whole case was going to go so he held back some information." According to the detective, Eller said "at this point now, he was sure he had no involvement." Eller again accused Grantham of having committed the robbery, and said that, on the night of the robbery, Grantham directed him to look in a particular ditch north of the store and, when he did so, "[h]e found a black bag with money, shoes, and a mask that was used." Eller did not know who the red haired male was who was with Grantham. Eller also "said there were other crimes that he and Grantham were involved in but he would not talk about those unless he was granted immunity." The detective showed Eller a six-person photo lineup containing defendant's picture. Eller denied that the person that was with Grantham was in the lineup. Later that day, the detective picked Eller up for the polygraph examination. While in the exam room, he decided not to take the exam.

## C. DEFENDANT'S INDEPENDENT INVESTIGATION

With the information gained from the unredacted police reports, defense counsel continued to seek additional evidence supporting an anticipated motion for post-judgment relief. On August 8, 2015, Eller wrote to defense counsel that he "know[s] 100% for sure your client is innocent" and asked for a face-to-face meeting with a guarantee of confidentiality. Eller claimed that he could give evidence of defendant's innocence, but "will not put myself under any prosecution heat, for lack of a better phrase." He also asked and circled at the bottom of the handwritten letter "Is there a statute of limitations on Robbery?" Defense counsel hired a former Wyoming Police detective to investigate further. Eller initially denied involvement but eventually confessed to the private investigator that he committed the armed robbery while Grantham drove the white Pontiac Grand Am. Eller also provided several unique details including how he asked the victims for cigarettes, wore a black ski mask and black clothes, and that another vehicle chased them. According to the private investigator, Eller claimed notoriety as "The Carton Kid" as portrayed by local news media because it was his custom to always demand cartons of cigarettes during robberies. Grantham denied involvement but once again admitted that Eller had told him that Eller used his car—the white Grand Am—in a robbery. Grantham's ex-wife and the two victims declined to speak with the private investigator.

Defense counsel also obtained statements from both trial counsel and original appellate counsel, both of whom suggested that the complete, unredacted reports included new information that would have been helpful to defendant's case.

## D. DEFENDANT'S MOTION FOR RELIEF FROM JUDGMENT

In March 2017, defendant filed his motion under MCR 6.500 *et seq.* to set aside the judgment of conviction and sentence based on arguments of newly discovered evidence, ineffective assistance of counsel, and an alleged *Brady*[1] violation.

The trial court denied defendant's motion without holding an evidentiary hearing. Accepting that the complete and unredacted reports contained newly discovered evidence, the trial court nevertheless concluded that the information would not "have had any likelihood of changing the outcome of trial, i.e., acquitting [d]efendant of any of the charges against him." The trial court believed that the testimony and in-court identifications of the two victims "was substantial evidence against [d]efendant, upon which any reasonable juror could have found [d]efendant guilty beyond a reasonable doubt." The trial court did not specifically address Eller's confession, Eller's knowledge of particulars of the crime, or the auto repair work order reflecting that Grantham's white Pontiac Grand Am had its tires replaced the day after the robbery and high-speed car chase.

---

[1] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

## II. DISCUSSION

### A. STANDARD OF REVIEW

We review a trial court's decision to grant or deny a motion for a new trial for an abuse of discretion. *People v Johnson*, 502 Mich 541, 564; 918 NW2d 676 (2018). "An abuse of discretion occurs when a trial court's decision falls outside the range of reasonable and principled outcomes." *Id.* (quotation marks and citation omitted). "A mere difference in judicial opinion does not establish an abuse of discretion." *Id*.

### B. DEFENDANT'S MOTION FOR A NEW TRIAL

Subchapter 6.500 of the Michigan Court Rules sets forth the procedure for post-appeal relief from a criminal conviction and provides the exclusive means for challenging a conviction once a defendant has exhausted the normal appellate process. *People v McSwain*, 259 Mich App 654, 678; 676 NW2d 236 (2003). Because defendant's motion was a successive motion for post-judgment relief, defendant was required to first meet a threshold requirement of presenting " 'new evidence that was not discovered before the first such motion.' " See *Robinson*, 503 Mich at 883, quoting *People v Swain*, 499 Mich 920; 878 NW2d 476 (2016); MCR 6.502(G)(2). Although it did not hold an evidentiary hearing, the trial court accepted that the evidence presented by defendant was new and satisfied this procedural bar to successive motions. We find no reason to disturb the trial court's determination that defendant presented new evidence, which also appears to be the understanding accepted by our Supreme Court. See *Robinson*, 503 Mich at 883.

Satisfying the new evidence procedural threshold for successive motions was only the initial qualifying step for defendant to receive a merits review of his motion for post-judgment relief. See *People v Swain*, 288 Mich App 609, 635-636; 794 NW2d 92 (2010). In order to obtain relief, once that initial threshold for reviewing a successive motion was met, defendant still needed to separately satisfy the requirements of MCR 6.508(D)(3), which "by its own language, applies to successive motions." See *id*. "MCR 6.508(D)(3) provides that a court may not grant relief to a defendant if the motion alleges grounds for relief that could have been previously raised, unless the defendant demonstrates both good cause for failing to raise such grounds earlier as well as actual prejudice." *Johnson*, 502 Mich at 565. " 'Cause' for excusing procedural default is established by proving ineffective assistance of appellate counsel, pursuant to the standard set forth in *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984), or by showing that some external factor prevented counsel from previously raising the issue." *People v Reed*, 449 Mich 375, 378; 535 NW2d 496 (1995).

Although the trial court did not expound on its reasoning, it was evidently satisfied that defendant's showing of new evidence satisfied the "good cause" standard. Because defendant was only able to obtain the complete and unredacted police reports as a result of his defense counsel's successful 2015 FOIA appeal, we agree that defendant could not have raised his claims at an earlier juncture. See *Johnson*, 502 Mich at 565. We disagree, however, with the trial court's application of the "actual prejudice" standard. The trial court determined only that the complete and unredacted police reports would not have had any likelihood of changing the outcome of trial. In coming to this conclusion, the trial court lumped together defendant's

separate claims of (1) newly discovered evidence; (2) a *Brady* violation; and (3) ineffective assistance of counsel, reasoning that "all require a showing that the outcome of [d]efendant's trial would have been different" and that defendant failed to make this showing.

As an initial matter, we conclude that the trial court misunderstood and incorrectly stated the governing legal standard for satisfying this particular element of each defense theory. In rejecting defendant's argument that there was a reasonable probability that the outcome of defendant's trial could have differed, the trial court held that there "was substantial evidence against [d]efendant, upon which any reasonable juror could have found [d]efendant guilty beyond a reasonable doubt," that this evidence "would have lead [sic] a reasonable juror to find [d]efendant guilty," and that "it cannot be said that there is a 'reasonable probability' that no reasonable juror would have found [d]efendant guilty." This recitation of the governing legal standard for reviewing a motion for post-judgment relief required too much from defendant because it more closely approached the higher legal standard for establishing "actual innocence," not "actual prejudice." See *Swain*, 288 Mich App at 638.[2]

This Court has held that the "actual prejudice" requirement for obtaining post-judgment relief "is similar to the prejudice standard in an ineffective assistance-of-counsel claim." See *id*. Stated simply, to obtain relief, defendant did not need to demonstrate that no reasonable juror would have found him guilty. Rather, he needed only to establish a reasonable probability that the result of his jury trial would have been different. See *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001). This determination hinged not on whether any reasonable juror could find him guilty beyond a reasonable doubt or "whether the defendant would have been more likely than not to have received a different verdict, but whether he received a fair trial in the absence of the evidence, *i.e.*, a trial resulting in a verdict worthy of confidence." See *People v Fink*, 456 Mich 449, 454; 574 NW2d 28 (1998). Defendant was not required to prove that the outcome would have resulted in acquittal. See *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014).

We find our Supreme Court's recent decision in *Johnson* dispositive. In that decision, our Supreme Court held that "[i]n order to determine whether newly discovered evidence makes a different result probable on retrial, a *trial court must first determine whether the evidence is credible.*" See *Johnson*, 502 Mich at 566-567 (emphasis added). The *Johnson* Court explained:

> In making this assessment, the trial court should consider all relevant factors tending to either bolster or diminish the veracity of the witness's testimony. *A trial court's function is limited when reviewing newly discovered evidence, as it is not the ultimate fact-finder; should a trial court grant a motion*

---

[2] "To satisfy the "actual innocence" standard, a defendant "must show that it is more likely than not that no reasonable juror would have found [the defendant] guilty beyond a reasonable doubt." *Swain*, 288 Mich App at 638, quoting *Schlup v Delo*, 513 US 298, 327; 115 S Ct 851; 130 L Ed 2d 808 (1995). Although defendant maintains his actual innocence, as a matter of law, this is a separate legal theory for relief.

*for relief from judgment, the case would be remanded for retrial, not dismissal. In other words, a trial court's credibility determination is concerned with whether a reasonable juror could find the testimony credible on retrial.* See *Connelly v United States*, 271 F2d 333, 335 (CA 8, 1959) ("The trial court has the right to determine the credibility of newly discovered evidence for which a new trial is asked, and if the court is satisfied that, on a new trial, *such testimony would not be worthy of belief by the jury*, the motion should be denied.") (quotation marks and citation omitted; emphasis added).

* * *

If a witness's lack of credibility is such that *no* reasonable juror would consciously entertain a reasonable belief in the witness's veracity, then the trial court should deny a defendant's motion for relief from judgment. However, if a witness is not patently incredible, a trial court's credibility determination must bear in mind what a reasonable juror might make of the testimony, and not what the trial court itself might decide, were it the ultimate fact-finder. [*Id*. at 567-568 (first emphasis added).]

In this case, the trial court exceeded its gatekeeping role and acted prematurely in denying defendant's motion. At the very least, the evidence presented by defendant necessitated an evidentiary hearing for the purpose of ascertaining the credibility of the evidence presented. See MCR 6.508(B). The trial court was required to determine in the first instance only whether defendant's new evidence was "patently incredible," and, if not, to contemplate "what a reasonable juror might make of the testimony" at a future retrial. See *Johnson*, 502 Mich at 568. By not making any initial credibility determination, the trial court improperly substituted itself as the ultimate fact-finder. See *id*. Furthermore, *Johnson* also instructs that "[i]f the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Johnson*, 502 Mich at 576 n 16 (quotation marks and citation omitted).

An abuse of discretion is cognizable where "the record discloses a clear mistake or omissions that preclude meaningful review . . . ." *People v Blevins*, 314 Mich App 339, 361; 886 NW2d 456 (2016). Because the trial court did not hold an evidentiary hearing before concluding that a different result was not probable on retrial, as required by *Johnson*, and did not apply the correct legal standard when considering defendant's motion, the trial court abused its discretion.

Reversed and remanded for additional proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ David H. Sawyer
/s/ Stephen L. Borrello
/s/ Douglas B. Shapiro